# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01592-COA

LA'DARRIAN MCCRAY A/K/A LADARRIAN A.             APPELLANT
MCCRAY A/K/A LADARRIAN MCCRAY A/K/A
D.J.

v.

STATE OF MISSISSIPPI                                            APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/07/2016 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ERIN ELIZABETH BRIGGS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/17/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND TINDELL, JJ.**

**LEE, C.J., FOR THE COURT:**

¶1. Following a jury trial in the Hinds County Circuit Court, La'Darrian "D.J." McCray was convicted of first-degree murder and attempted aggravated assault. McCray was sentenced to life imprisonment for the murder conviction and twenty years for the aggravated-assault conviction, with the sentences ordered to run concurrently in the Mississippi Department of Corrections. In this direct appeal, McCray argues that he (1) received ineffective assistance of counsel, and (2) the trial court erred by denying his motion

for a judgment notwithstanding the verdict (JNOV) with respect to the aggravated-assault conviction. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. In the early morning hours of October 17, 2014, Glentez Brown was shot several times and killed at his apartment complex in Jackson, Mississippi. At trial, Brown's wife, Ashley, testified that on the evening of the shooting, Brown was driving his cousin, Wesley Gray, home and then driving around their three-month-old infant son, trying to calm his crying and help him fall asleep. Ashley spoke to Brown on the phone and told him to come home because the baby was not falling asleep. A few minutes later, Ashley heard gunshots and went and looked out the window where she saw a man wearing a gray hoodie and dark jeans walk past her window with a gun in his right hand. She testified that she was able to see his face clearly, but she did not recognize or know him. Ashley saw that the couple's vehicle was present, indicating that Brown had returned with the baby. She also saw a silver truck fleeing the apartments.

¶3. Ashley opened her apartment door, which was located on the second floor, and heard her son screaming. She looked down the stairs and saw her husband and son lying on the ground covered in blood. Ashley went down to them, but went back upstairs to the apartment to let her daughter know her father had been shot, and to get her phone. She went back downstairs again to her husband and son and called 911. Ashley picked up her baby and checked Brown's pulse and then returned upstairs to call family members and friends. Ashley's neighbor, Latricia Dent, came out and offered to take the baby for her, and so Dent

took the baby back to her own apartment.

¶4. Ashley called Brown's brother, Joseph, several times trying to get in touch with him. After five calls, she finally reached him by phone and told him that Brown was dead. Joseph, along with two of his friends, and his ex-girlfriend, Lezert "Pumpkin" Edwards, arrived at the apartment. At some point after Joseph and Edwards arrived, Ashley was in the ambulance while her son was being checked for injuries. The baby was not injured.

¶5. While in the ambulance with the baby, Ashley saw a man pass by outside the ambulance, and she asked Edwards, who was standing outside the doors of the ambulance, who the man was. Ashley testified that she asked who the man was because he was the same man she had seen pass by her apartment window with a gun immediately after hearing gunshots. The man was no longer wearing a hoodie and now had on glasses. Edwards replied that the man was "D.J." (McCray). Ashley later learned that McCray was friends with Joseph. Ashley admitted both during the investigation and at trial that Brown was a drug dealer, but denied that he was fighting or at odds with anyone. She also testified that she did not immediately report McCray as the man with a gun to the police at the scene for fear of her and her children's safety.

¶6. Dent, Ashley's neighbor, also testified at trial that she heard gunshots and went outside where she saw a man and a baby on the ground. She went back inside and awoke her brother, and he called 911. When Dent went back outside, she saw Ashley holding the baby and vomiting. Ashley handed Dent the baby, and Dent took the baby back into her apartment and kept him for Ashley. She examined the baby and described that he was covered with

3

blood and a white meaty substance on his face, in his hair, mouth, and clothes, but that she saw no physical marks or injury to his body. She also testified that the baby screamed continuously from the time she took him from Ashley to the time he was examined in the ambulance—approximately two-and-a-half hours.

¶7. Edwards testified that on the evening of the shooting she was at a local nightclub and later saw Joseph there too. Edwards testified that she had broken up with Joseph earlier that day due to his drug use and behavior. Within five to ten minutes of seeing Joseph at the nightclub, he told her that they had to leave because Brown had been killed. Edwards rode separately to Ashley's apartment. She stated that when she arrived, Joseph was already there, along with his friends, "Red" and McCray. She stated that later on at the scene, while she was standing at the ambulance with Ashley, Ashley asked her who the man was near the ambulance. Edwards corroborated that Ashley told her he looked like the man she had seen earlier leaving the scene. Edwards stated that she told McCray what Ashley had said and that McCray left the scene shortly thereafter.

¶8. Detective Jermaine Magee with the Jackson Police Department testified that he was dispatched to the scene in the early morning hours where he discovered Brown's "lifeless motionless body lying on floor on the ground near a stairwell." He stated that there were baby items and shell casings next to Brown. Shortly after receiving the call about the shooting, a call came in reporting a silver truck burning in a nearby area.[1] Detective Magee

---

[1] McCray was also indicted for arson, but the trial court granted the defense's motion for a directed verdict. The jury accordingly returned a verdict of "not guilty" with respect to the arson charge.

briefly interviewed Ashley at the scene, and she described what had transpired, including seeing an individual running from the scene with a gun in his hand, but she did not report the identity of the man. Detective Magee then spoke with Ashley on the phone the next day and she told him she knew who had killed Brown, but she would not reveal the identity over the phone because she was in fear for her life. They spoke again by phone on October 19, 2013, and Ashley disclosed McCray's identity to Detective Magee. On October 20, 2013, after Ashley was able to move herself and her children out of her apartment, Detective Magee interviewed her in person, and she again gave an account of what happened on the night of the shooting. She was then given an opportunity to view a six-person photographic lineup where she selected the person she saw running from the scene with a gun. The person she identified was McCray.

¶9. Dr. Lisa Funte, Deputy Chief Medical Examiner for the State of Mississippi, conducted an autopsy on Brown. She testified that Brown suffered several gunshot wounds and died as a result.

¶10. Following a jury trial, McCray was convicted of first-degree murder of Brown and of attempted aggravated assault of the baby. McCray now appeals.

## DISCUSSION

### I. Ineffective Assistance of Counsel

¶11. In his first issue, McCray argues that he received ineffective assistance of counsel denying his right to a fair trial because his attorney failed to request a circumstantial-evidence jury instruction. McCray contends the evidence presented by the State was purely

5

circumstantial and the jury was not properly instructed. "A circumstantial-evidence case is one where the State is 'without a confession and wholly without eyewitnesses to the gravamen of the offense charged.'" *Carson v. State*, 125 So. 3d 104, 106 (¶5) (Miss. Ct. App. 2013) (quoting *Garrett v. State*, 921 So. 2d 288, 291 (¶17) (Miss. 2006)). "The term 'gravamen' is defined as the 'substantial point or essence of a claim, grievance, or complaint.'" *Id*. (quoting *McInnis v. State*, 61 So. 3d 872, 876 (¶13) (Miss. 2011)). McCray argues that because there was no confession and no eyewitnesses to Brown's shooting, he was entitled to a circumstantial-evidence jury instruction to instruct the jury that it could not render a guilty verdict unless the State proved his guilt "beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence." (Citing *Keys v. State*, 478 So. 2d 266, 267 (Miss. 1985)).

¶12. McCray also argues that his defense attorney rendered ineffective assistance of counsel by withdrawing his motion for a new trial. At trial, McCray's attorney filed a motion for JNOV, or in the alternative, a new trial. His attorney withdrew the motion for a new trial and stated the defense would proceed on the motion for a JNOV. McCray argues that the withdrawal of the motion deprived the trial court the opportunity to review the weight of the evidence. "The contention that the verdict is against the overwhelming weight of the evidence must first be raised in the defendant's motion for a new trial." *Hunter v. State*, 187 So. 3d 674, 678 (¶13) (Miss. Ct. App. 2016) (quoting *Beckum v. State*, 917 So. 2d 808, 813 (¶14) (Miss. Ct. App. 2005)). "A claim that the verdict was against the weight of the evidence must be first presented to the trial court since that court is best positioned to make

6

an informed decision as to such issue, having had the benefit of hearing the evidence first-hand." *Id*. (quoting *Collins v. State*, 858 So. 2d 217, 218-19 (¶5) (Miss. Ct. App. 2003)).

¶13.   A claim for ineffective assistance of counsel should only be addressed on direct appeal where "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Reed v. State*, 204 So. 3d 785, 789 (¶16) (Miss. Ct. App. 2016) (quoting *Johnson v. State*, 196 So. 3d 973, 975 (¶7) (Miss. Ct. App. 2015)).  The parties here do not stipulate that the record is adequate for the appellate court to make a finding on direct appeal.  "Thus, the only proper inquiry is whether the record affirmatively shows that [the defendant] was denied effective assistance of counsel." *Id*.  "Where the record cannot support an ineffective-assistance-of-counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a petition for [postconviction relief]." *Id*. (quoting *Johnson*, 196 So. 3d at 975 (¶8)).

¶14.   In an ineffective-assistance-of-counsel claim,

> a defendant must show that: (1) his counsel's performance was deficient, and (2) this deficiency prejudiced his defense. The burden of proof rests with the defendant to prove both prongs. Under *Strickland*,[2] there is a strong presumption that counsel's performance falls within the range of reasonable professional assistance. To overcome this presumption, the defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different.

*Renfrow v. State*, 202 So. 3d 633, 636 (¶7) (Miss. Ct. App. 2016) (quoting *Maggitt v. State*,

---

[2] *Strickland v. Washington*, 466 U.S. 668 (1984).

26 So. 3d 363, 365 (¶12) (Miss. Ct. App. 2009)). There is also a presumption that decisions made by defense counsel are strategic, and this Court "will not second-guess counsel's decisions that fairly may be characterized as strategic." *Shinn v. State*, 174 So. 3d 961, 966 (¶12) (Miss. Ct. App. 2015). Finally, we look "at the totality of circumstances to determine whether counsel's efforts were both deficient and prejudicial." *Howell v. State*, 163 So. 3d 240, 259 (¶49) (Miss. 2014) (quoting *Williams v. State*, 73 So. 3d 1125, 1129 (¶12) (Miss. 2011)).

### A.    Circumstantial-Evidence Jury Instruction

¶15.    McCray argues that this case was wholly circumstantial. The State argues that McCray was not entitled to a circumstantial-evidence jury instruction because there was both direct and circumstantial evidence. However, "[d]irect evidence that a crime was committed without direct evidence that the defendant committed the crime, is not enough to defeat a circumstantial evidence instruction." *Turner v. State*, 945 So. 2d 992, 1002 (¶33) (Miss. Ct. App. 2007). Stated differently, "direct evidence that avoids the instruction must directly and not by inference implicate the accused and not just show that there has been a crime." *Price v. State*, 749 So. 2d 1188, 1194 (¶16) (Miss. Ct. App. 1999).

¶16.    The supreme court has defined circumstantial evidence as "evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist." *McInnis*, 61 So. 3d at 875 (¶11). "A circumstantial evidence instruction must be given when the prosecution is without a confession and without eyewitnesses to the gravamen of the offense charged." *Turner*, 945 So. 2d at 1002 (¶33).

8

¶17. In the instant case there was no direct evidence—eyewitness or confession—that McCray shot and killed Brown. The evidence presented placed McCray at the crime scene with a gun immediately after Brown was shot—giving rise to the logical inference that McCray shot Brown. Thus, the case was wholly circumstantial. "If the only direct evidence in a homicide case is testimony that a witness heard a gunshot and then saw the victim fall dead, the case that proves the guilt of a specific defendant is still wholly circumstantial." *Price*, 749 So. 2d at 1193 (¶16) (citing *Hooker v. State*, 716 So. 2d 1104, 1107 (Miss. 1998)). "Failure to request a circumstantial evidence instruction, when the evidence against one's client is wholly circumstantial falls below the standard of reasonable professional assistance." *Turner*, 945 So. 2d 992 at 1002 (¶33). Therefore, McCray's counsel's performance was deficient for failing to request a circumstantial jury instruction. McCray has met this first prong of *Strickland*, but our inquiry does not end here.

¶18. Under the second prong of *Strickland*, McCray must show that deficiency prejudiced his defense. *Renfrow*, 202 So. 3d at 636 (¶7) (quoting *Maggitt*, 26 So. 3d at 365 (¶12)). For prejudice to exist, there must be a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. That is, "the reviewing court must determine whether the insufficiency had a 'reasonable probability' of affecting the outcome of the case." *Carson v. State*, 212 So. 3d 22, 27 (¶17) (Miss. 2016) (citing *Strickland*, 466 U.S. at 695)). "A 'reasonable probability' means that the confidence of the court in the outcome is undermined, not that it is certain that the verdict would have been different." *Id*.

9

¶19.    McCray's counsel was deficient in failing to request the circumstantial-evidence instruction that would have increased the burden of proof on the State.  However, we find that McCray fails to show how his counsel's failure to request the circumstantial-evidence jury instruction prejudiced his defense so that "the result of the proceeding would have been different."  "Circumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence, and, in fact, 'a conviction may be had on circumstantial evidence alone.'"  *Williams v. State*, 122 So. 3d 105, 108-09 (¶17) (Miss. Ct. App. 2013) (quoting *Tolbert v. State*, 407 So. 2d 815, 820 (Miss. 1981)).

¶20.    We cannot say that the trial record affirmatively shows ineffective assistance of counsel of constitutional dimensions.  Accordingly, we decline to rule on the claim, in order to preserve his right to argue the issue in a PCR motion.

### B.    Motion for a New Trial

¶21.    McCray also argues that he received ineffective assistance of counsel because his defense attorney withdrew the motion for a new trial.  "A motion for a new trial challenges the weight of the evidence."  *Leonard v. State*, 972 So. 2d 24, 30 (¶22) (Miss. Ct. App. 2008).  A motion for a new trial "must be first presented to the trial court since that court is best positioned to make an informed decision as to such issue, having had the benefit of hearing the evidence first-hand."  *Allen v. State*, 200 So. 3d 1100, 1101 (¶3) (Miss. Ct. App. 2016).

¶22.    A reading of the transcript shows that during the sentencing hearing, the trial judge asked McCray's defense counsel whether the motion she was arguing was "to be considered

a motion for new trial or, in the alternative, for a suspended sentence?" McCray's counsel indicated that she would "withdraw the new trial from that motion, and . . . address it in the JNOV." She further stated she would "stand by the portion of that motion" which referred to a motion for a suspended sentence. McCray's counsel subsequently filed a motion for "Motion For Judgment Non Obstante Verdicto (JNOV) or, in the alternative, A New Trial" which addressed the weight of the evidence. As such, a motion for a new trial challenging the weight of the evidence was presented to the trial court for its consideration. This issue is without merit.

## II.     Motion for JNOV

¶23.    In his final issue on appeal, McCray argues that the trial court erred when it denied his motion for a JNOV because the evidence was insufficient to sustain a conviction of aggravated assault. Specifically, McCray argues that there was no proof that he possessed the intent required for attempted aggravated assault, and the trial court should have granted his motion.

¶24.    This Court's standard of review for a trial court's grant or denial of a motion for JNOV is de novo. *Estate of Gardner v. Gardner*, 228 So. 3d 921, 926 (¶19) (Miss. Ct. App. 2017). A motion for a JNOV challenges the legal sufficiency of the evidence, and where there is substantial evidence to support the verdict, we will affirm the denial of a JNOV. *InTown Lessee Assoc. LLC v. Howard*, 67 So. 3d 711, 718 (¶22) (Miss. 2011). "Substantial evidence is information of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions." *Bryant v.*

11

*State*, 151 So. 3d 1025, 1029 (¶13) (Miss. Ct. App. 2014) (quoting *Daniels v. State*, 107 So. 3d 961, 963 (¶10) (Miss. 2013)). "When reviewing a motion for a JNOV, the trial judge is required to accept as true all of the evidence that is favorable to the State, including all reasonable inferences that may be drawn therefrom, and to disregard evidence favorable to the defendant." *Id*. at (¶14) (internal quotation mark omitted). "We will reverse only where with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair minded jurors could only find the accused not guilty." *Id*. (internal quotation marks omitted).

¶25. Mississippi Code Annotated section 97-3-7(2)(a)(ii) (Rev. 2014) states that a person is guilty of aggravated assault if he "attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm . . . ." "An attempt to commit a crime consists of three elements: (1) an intent to commit a particular crime, (2) a direct ineffectual act done toward its commission, and (3) the failure to consummate its commission." *Craig v. State*, 201 So. 3d 1108, 1111 (¶9) (Miss. Ct. App. 2016) (quoting *Brooks v. State*, 18 So. 3d 833, 841 (¶33) (Miss. 2009)). "For an attempt crime, an intent to commit the particular crime must be established." *Id*. at 1114 (¶18). "Intent may be established by inference from circumstantial evidence." *Parish v. State*, 203 So. 3d 718, 723 (¶19) (Miss. Ct. App. 2016). "Circumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence, and, in fact, 'a conviction may be had on circumstantial evidence alone.'" *Williams*, 122 So. 3d at 108-09 (¶17) (quoting *Tolbert v. State*, 407 So. 2d 815, 820 (Miss. 1981)). We note that "the jury

12

may draw any reasonable inferences from all the evidence in the case." *Id.* at 108 (¶17) (quoting *Anthony v. State*, 23 So. 3d 611, 623 (¶53) (Miss. Ct. App. 2009)).

¶26. Having accepted as true all the evidence favorable to the State, the evidence is not such that reasonable and fair-minded jurors could only have found McCray not guilty. Rather, reasonable and fair-minded jurors could have inferred from the evidence that McCray shot Brown; that Brown was holding his infant son when he was shot multiple times; and that McCray thus possessed the intent to commit aggravated assault, that is he attempted to inflict serious bodily injury with a deadly weapon—namely a gun, upon the baby. Because the evidence is not such that reasonable and fair minded jurors could only find McCray not guilty, we affirm the trial court's decision. The trial court did not err by denying McCray's motion for a JNOV.

¶27. **AFFIRMED.**

**IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**